538

THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* LUIS MEDIAVILLA, known as LUIS VILLA, Defendant and Appellant.

No. 7116. Argued February 2, 1939.—Decided March 29, 1939..

*R. Martínez Nadal* and *C. H. Juliá,* for appellant; *R. A. Gómez, Prosecuting Attornuey* for the appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the Court.

Luis Mediavilla was charged with murder in the second degree, committed upon Juan Cosme. The jury found him

guilty of voluntary homicide and the District Court of Bayamón sentenced him to seven years imprisonment, at hard labor. He appealed to this Court, and as grounds for review assigns six errors, to wit:

"*First:* The verdict in this case is contrary to the evidence.

"*Second:* The verdict in this case is contrary to law.

"*Third:* The lower court committed error in refusing the special instructions requested.

"*Fourth:* The lower court committed error in refusing to give instructions as to self-defense.

"*Fifth:* The lower court committed error in denying the motion asking for a new trial.

"*Sixth:* The lower court committed error when it refused to include in the Transcript of Evidence the petition for a new trial, the special instructions requested and the exceptions taken from said instructions."

█ The first two errors assigned claim that the verdict is contrary to the evidence and to law. Discussion of these assignments requires that we make a *résumé* of the evidence.

The case for the prosecution tends to show that the deceased, Juan Cosme, on January 6, 1937, went to call on his sister-in-law, Beatriz Marrero, who lived in the ward Palmarejo of the municipality of Corozal. He brought some candy for his sister-in-law's children and asked her whether she knew if a dance was to be held that day in the vicinity. Beatriz answered that she did not know. He presented her with wine which he carried in a bottle and then had lunch at the house. After the lunch Luis Mediavilla arrived; he had been living at the house since his marriage to Ana Negrón, Beatriz's daughter. Beatriz was in the kitchen and heard Mediavilla and Cosme greet each other when the first one came in. Mediavilla went on to the kitchen where he started a conversation with Beatriz, and complained that he had to cut down some tobacco the next day and that the weather was not favorable for that. Cosme, who heard the conversation from the living-room, interrupted and said that he should

do as they used to in Comerío, that is, strip off the leaves in the field instead of cutting the plant down. To this Mediavilla answered that he did not favor that method because it impaired the quality of the tobacco. A short time later Mediavilla left the kitchen and went to the living-room, where Cosme had remained. Beatriz, who stayed in the kitchen, right away heard a shot, thought it was a fire-cracker and paid no attention, but immediately heard one or two more, and went to the living-room. She saw the two men fighting hand to hand. She pushed Luis Mediavilla away and noticed then that Cosme was wounded. She called to the neighbors for help. She took the wounded man to the kitchen, but as help was not forthcoming she put him in her bed. At that time Fernando Santiago arrived; he was the nearest neighbor and had heard the shots and came to help in answer to Beatriz' requests. When he came in he passed Mediavilla going out. He went to the bed where Cosme lay and asked him what had happened, and he answered: "I am wounded. Mediavilla shot me down for a trifle." Santiago sent to his house for a hammock and with the help of other neighbors took the wounded man to the San Alberto Hospital, in Bayamón, where he died the following day from the two wounds received.

None of the witnesses, for the prosecution or the defense, saw Cosme in possession of any weapon or tool at the place of events. Only the defendant, as we shall see later, testified as to the chisel with which the deceased according to him, tried to attack him. This testimony was indirectly corroborated by Dr. Piñero, who made the autopsy, and who declared that he had been able to talk to Cosme in the hospital where he was the interne physician. On cross-examination by the defense and talking about the deceased the doctor said:

"He was conscious, surely, and always complained that unfortunately he had been unable to make use of his weapon; but I told him not to get excited; he always insisted in that same thing, he

insisted that he had been unable to use his weapon, that his children would take care of his revenge.''

The words that the witness Fernando Santiago claims were said by the deceased, which have been quoted, were not heard by the boy Ernesto Negrón, Mediavilla's brother-in-law, who arrived at Beatriz' house before Mediavilla.

Beatriz testified, further, that her daughter Ana, Mediavilla's wife, had requested Cosme twice about a month before, not to come again to her small store, because Cosme went there to talk with a woman of ill repute, of whom Cosme's wife was jealous. The latter, who was Beatriz's sister and Ana's aunt, had found fault with her niece for letting Cosme talk in her house to the said woman. That Cosme was vexed by what Ana said and answered that he knew her to act at Mediavilla's (her husband's) suggestion; and added:

''I thought I had a friend; from now on I have an enemy; we shall fix it up later.'' (R. p. 15.)

On cross-examination Beatriz said that about six weeks before the events, Cosme came to complain of Ana's acts, and repeated what is stated above.

The defendant describes his struggle with the deceased in this way:

''I turned back, but when I crossed the living room, I met him squarely; when I entered the way out, he had jumped on his feet where he was sitting and when I was about to pass he jumped from the table and grabbed me and says: ''Today we are going to fix what you owe me''; and came over me, he pushed quite hard; when we fell down there, he kept his hand into his shirt bosom; when I saw that, I also drew—I had my revolver in my bosom—when I drew my hand and he saw the gun, he came on, and on, and I evading him, and I fired a shot into the air; he came upon me and reached the wall, he cornered me against the wall; when we caught each other a board split underneath and I slipped down the opening; in the struggle I saw myself lost and fired a shot at him; we grapped on in the struggle and then I fired at him again. That is the whole truth.'' (R. p. 48.)

He made no reference to any chisel the deceased had at the time, but after the narrative we have quoted, his attorney asked him:

"What sort of a chisel was that?

"A black chisel, rather large.

"And the handle?

"Wooden.

"Prosecuting Attorney: It is the attorney who speaks now of a chisel. He has said none of that.

"What did he carry in his hand?

"A chisel.

"What sort of a chisel?

"A black one, it had quite many inches and a wooden handle." (R. p. 48.)

In his statement the defendant said that the deceased attacked him with the chisel, that he fired the first shot up in the air to frighten him, but the deceased did not recede, and that it was then that the board split. (R. p. 50.)

From the evidence it also appears that the defendant had no knowledge of the threats and slander Cosme is alleged to have uttered about the defendant in front of the latter's wife, Ana Negrón.

After the defense witness, Juan Negrón Santana, identified the chisel as belonging to the deceased, the defense offered it in evidence and it was admitted. (R. p. 63.)

That is, in brief, the evidence that caused the verdict rendered by the jury. Acting within its power to weigh the evidence, the jury gave no credit to the self defense theory presented by the defendant. In so doing, it committed no error, because there is a conflict of evidence. Nobody but the defendant saw the chisel in question in the hands of the deceased. Dr. Piñero repeats, as the deceased's, the statement we know, from which it may be inferred that the deceased must have had a weapon which he was unable to use when he was attacked by the defendant. On the other hand, Beatriz Marrero's statement, who arrived when the defendant

and the deceased were still struggling with each other, at a time when the latter, wounded already, had no reason to conceal his weapon, and the testimony of Ernesto Negrón, the accused's brother-in-law, and Fernando Santiago, both of whom were among the first to arrive, and saw no such weapon, allowed the jury to decide the conflict of evidence by rejecting the defendant's theory, and Dr. Piñero's statement as far as self-defense is concerned. The evidence presented by the Prosecutor contains all the elements of the crime of voluntary homicide, and as the jury did not believe the evidence as to the self-defense claimed by the defendant, it is imperative to conclude that the verdict was not contrary to law or to the evidence.

■ The third and fourth assignments of error charge the lower court with failing to deliver specific instructions as to self-defense and not giving general instructions on the same matter.

We have examined the stenographic record and the Court's instructions to the jury and found nothing to show that said specific instructions were requested. Only the following appears at the end of the instructions, and in the manner of a note by the stenographer:

"After the Marshal was sworn and the jury retired, Mr. Juliá said: 'I take exception to the Court's denial to instruct upon the last instructions.' " (R. p. 73.)

The Court's last instructions are those that appear on page 73 of the Record, and refer to reasonable doubt and giving the defendant the benefit of the doubt in the determination of the offense, finding him guilty of the lesser crime, in this case manslaughter, if they believed him guilty but had doubts as to the degree of the offense, that is, whether it was murder in the second degree or voluntary homicide. No other exception was taken to the instructions, and it being so, we cannot consider the alleged error. *People v. Rodríguez*, 34 P.R.R. 443, 446; *People v. Ramírez*, 50 P.R.R. ____; *People v. Saltari*, 53 P.R.R. ____.

■ The defendant maintains that the Court gave no instructions upon self-defense and merely did upon defense of home.

The Court's instructions to which the defendant refers appear on pages 68–70 of the record and for the better understanding of the argument we copy them here:

"The defendant's theory is that he, while he killed Juan Cosme, *he did it in self-defense within his own home.* To uphold this theory, which can be summed up as follows: that when he returned from the kitchen of Beatriz Marrero's house, Juan Cosme rushed upon him, grabbed him and they struggled; Cosme tried to draw and did draw out from his waist a chisel-like instrument and that when he tried to assault him, he used his revolver and fired three shots at him. To uphold this theory he presented the testimonies of Ana Negrón, Andrés Marrero, Andrés Figueroa, Félix Negrón, Juan Negrón and his own testimony.

"As I have said, the defendant's theory, according to the trend of their evidence, *is self-defense within the own home.* Section 209 of the Penal Code says that homicide may be justified, among other cases, when committed by any person in defense of his habitation, property or *person,* against anyone who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein.

"And Section 210 of the same Code says that the bare fear of the commission of any of the offenses mentioned in Section 209 which have been referred to, to prevent which homicide may be lawfully committed, the bare fear that such a crime is to be committed is not sufficient to justify it, but the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.

"A felony, the gentlemen of the jury know, is a heinous crime; that is, a crime punished by imprisonment in the penitentiary. And every illegal act done to cause bodily harm to a human being, with the intent to cause him harm, no matter what the means used or the degree of violence employed, constitutes a crime of battery. And every attempt to commit battery, or any threatening gesture that either by itself or by word shows the immediate intention, joined to the ability to commit battery, is an assault.

"The law conclusively establishes as a justification of homicide, its commission in defense of one's own home. This does not mean that in every case life can be taken when someone illegally enters or tries to enter in the abode of another or who within another's dwelling tries to assault or does assault someone. It is necessary that he manifestly intends or endeavors, by violence or surprise, to commit a felony, or assault in a violent, riotous or tumultuous manner any person therein, and it is not enough to justify homicide the bare fear of the commission of any of these offenses, but the circumstances must be sufficient to excite the fears of a reasonable person and the party killing must have acted under the influence of such fears alone.

"The fear the law refers to, as in the case of self-defense, is not that of a coward, but the fear of a man or regular courage, of quiet turn of mind. The law cannot deny punishment to he who brings about the death of another for the trivial reason of fear of bodily harm or loss of life. That is why it is required that to the impression received by the defendant, other acts concur that may raise the fear of a reasonable person.

"It is my duty to say to the gentlemen of the jury that when self-defense occurs inside one's own home, it becomes less strict. The dweller may repel force with force in defense of his person, home or property against he who manifestly tries or endeavors by violence or surprise to commit a felony or assault him in a violent, riotous or tumultuous manner; in this case he has no duty to retreat or escape, but he can resist his opponent until he has made sure that danger is over, and if under such conditions he kills, the homicide is justifiable and he must be discharged.

"The jury shall consider the defendant's conduct and that of the deceased, the means and amount of force employed and all the concurrent conditions, and if you find that all these are sufficient to raise the fear of a reasonable person, and if you believe that the defendant acted only under the influence of such fear, as determined by law, self-defense will have been established or otherwise shall be discarded."

The instructions on self-defense are not entirely correct. It is a well established rule, in civil and criminal cases, that instructions to the jury should agree with the case as it appears from the evidence, and it is error to deliver to the

jury any instruction, no matter how correct, in the abstract, if it is not supported by the evidence.

In the present case there is nothing in the evidence to show that the death occurred in defense of habitation. It is true that Mediavilla lived in the house where the crime was committed, and that was legally his home, but it is also true that Cosme was there lawfully, with the acquiescence of his sister-in-law, the lady of the house. Accepting as true the defendant's evidence as to self-defense, all that arises thereof is defense of the person, but there is not a scintilla of evidence that justifies instructions as to defense of habitation. The error, however, though it was committed, did not prejudice the defendant, because the jury could not have been misled by the instruction; the manner in which the deceased entered the house left the jury no doubt that it was not a case of defense of habitation.

Ruling Case Law deals with this matter as follows:

"But while it is error to give a charge not applicable to the case as made by the evidence, it is harmful error only when the complaining party may probably have been prejudiced by the instruction. The courts, however, ordinarily regard the giving of an instruction having no basis or foundation in the evidence in the case in which it is given as prejudicial, *unless it is clearly apparent that the jury could not have been misled by it.*" 14 R.C.L. 791.

See also *People* v. *Mejía,* 33 P.R.R. 856; *State* v. *Leatherwood,* 194 P. 600, 602; *State* v. *Moore,* 233 P. 523, 525.

▉ Besides this reasoning, there is another reason why we should not take into consideration the alleged error, because as we have said, the defendant took no exception to the instructions on self-defense delivered by the Court, and gave no opportunity for amendment. *People* v. *Boria,* 12 P.R.R. 166; *People* v. *Ramírez de Arellano,* 25 P.R.R. 243; *People* v. *Matos,* 26 P.R.R. 520; *People* v. *Concepción,* 30 P.R.R. 443; *People* v. *Valentín,* 36 P.R.R. 386; *People* v.

*Peña Ramos,* 39 P.R.R. 844, 845; *People* v. *Maldonado,* 45 P.R.R. 405, 407; *People* v. *Mercado,* 46 P.R.R. ____, ____; *People ex rel Rosario* v. *Ferrer,* 47 P.R.R. ____; *People* v. *Nieves,* 48 P.R.R. ____.

 There is nothing in the record to show that a petition for a new trial was filed and denied by the lower court. The only knowlege we have is the assertion of the defendant's attorney in his fifth assignment of error when he charges as such the alleged denial of a new trial. As the record does not disclose such an order as having been given, and as it was not appealed from, we cannot consider said assignment of error.

 The sixth error assigned charges the court with having refused to include with the evidence the motion for a new trial, the special instructions it is claimed were requested, and the exceptions taken to the denial to deliver said instructions.

As to the motion for a new trial, it is evident that no appeal being taken from the denial thereto, it was not proper to include such motion in the transcript of proceedings, since the referred order was not subject to the appeal, which was only taken from the judgment. See the petition for appeal at pages 4–5 of the transcript of proceedings.

As to the refusal to add to the transcript of evidence the special instructions it is claimed were requested and denied, and the exceptions thereon, the defendant should have appealed from said refusal to this Court and so made perfect the transcript, before the judgment roll was brought up to this Court. In other words, within this appeal taken from the judgment defects or omissions in the transcript of evidence or transcript of proceedings cannot be considered.

For the above reasons, the judgment appealed from must be affirmed.